**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE KEMPER SPORTS MANAGEMENT DATA BREACH LITIGATION* | Case No. 1:24-cv-08503<br><br>Hon. Joan B. Gottschall<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Rachel Getzinger, Kelli Seals, Edwin Scheide, Kendra Davila, William Campe, Corey Bergamo and Tracy Kading (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, state as follows for their consolidated class action complaint against Defendant Kemper Sports Management, LLC ("KemperSports" or "Defendant"):

### INTRODUCTION

1.      KemperSports is a golf sports and hospitality management company that manages over 140 golf courses, private clubs, sports venues and destination resorts nationwide.

2.      On April 1, 2024, KemperSports discovered it had lost control over its computer network and the highly sensitive personal information stored on its computer network in a targeted data breach perpetrated by cybercriminals ("Data Breach"). The Data Breach exposed the personal information of approximately 63,000 current and former KemperSports employees.

3.      According to information provided by Defendant, the Data Breach occurred on April 1, 2024. Following an internal investigation, Defendant determined that unauthorized cybercriminals successfully "accessed" files containing employees' personally identifiable

information ("PII"), including but not limited to full names, addresses, Social Security numbers, financial information, medical information, and health insurance information.[1]

4.      On or about September 9, 2024–five months after the Data Breach was discovered–KemperSports finally began notifying Class Members about the Data Breach ("Breach Notice"). A sample Breach Notice is attached as Exhibit 1.

5.      Upon information and belief, cybercriminals were able to target and breach Defendant's systems because Defendant failed to maintain reasonable industry-standard security safeguards or protocols to protect the Class's PII and failed to adequately train its employees on cybersecurity in handling and securing the PII in its possession—rendering it an easy target for cybercriminals.

6.      Defendant's Breach Notice obfuscated the nature of the Data Breach and the threat it posted—refusing to tell its employees how many people were impacted, how the Data Breach happened, whether the exploited vulnerabilities has been secured, or why it took the Defendant more than five months to finally begin notifying victims that cybercriminals had gained access to their highly private information.

7.      Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

8.      Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

---

[1] https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (listing categories of PII exposed in the KemperSports Data Breach).

9. In failing to adequately protect its employees' highly sensitive PII, adequately notify them about the Data Breach, and obfuscating the nature of the Data Breach, Defendant violated state law and harmed 62,815 current and former employees.

10. Plaintiffs and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

11. Plaintiffs are current and former employees of Defendant and Data Breach victims.

12. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiffs and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

13. Plaintiff Rachel Getzinger is a natural person and citizen of McHenry County, Illinois, where she intends to remain.

14. Plaintiff Kelli Seals is a natural person and citizen of Des Moines, Washington, where she intends to remain.

15. Plaintiff Edwin Scheide is a natural person and citizen of Lake Zurich, Illinois, where he intends to remain

16. Plaintiff Kendra Davila is a natural person and citizen of Hesston, Kansas, where she intends to remain.

17. Plaintiff William Campe is a natural person and citizen of Lexington, Kentucky, where he intends to remain.

18.     Plaintiff Corey Bergamo is a natural person and citizen of Palos Heights, Illinois where he intends to remain.

19.     Plaintiff Tracy Kading is a natural person and citizen of Vernon Hills, Illinois where she intends to remain.

20.     Defendant KemperSports is a limited liability company with its principal place of business located in 500 Skokie Boulevard, Suite 444, Northbrook, Illinois 60062.

## JURISDICTION & VENUE

21.     This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class. Plaintiffs Seals, Davila and Campe and Defendant are citizens of different states.

22.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District and does substantial business in this District.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### KemperSports

24.     KemperSports boasts on its website that it strives to "act and conduct business with integrity while holding our relationships sacred. We treat our business, our teams, our clients and our members like family." [2] It touts an annual revenue of $410 million.[3]

---

[2] Kempersports, https://www.kempersports.com/about-us/ (last visited Sept. 18, 2024).
[3] Zippia, https://www.zippia.com/kempersports-careers-28501/revenue/ (last visited Sept. 18, 2024).

25.    On information and belief, KemperSports accumulates and stores the highly confidential PII of its current and former employees.

26.    In collecting and maintaining its employees' PII, Defendant agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

27.    KemperSports understood the need to protect its current and former employees' PII and prioritize its data security and the consequences that would result to Plaintiffs and Class Members if it failed to do so.

28.    Indeed, KemperSports states in its Privacy Policy that "[w]e follow generally accepted industry standards designed to protect the personal information we receive from unauthorized access or disclosure."[4]

29.    Despite recognizing its duty to do so, on information and belief, KemperSports did not and still has not implemented reasonably cybersecurity safeguards or policies to protect employees' PII or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, KemperSports leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees' PII.

***KemperSports Fails to Safeguard Employees' PII***

30.    As a condition of their employment with KemperSports Plaintiffs provided Defendant with their PII, including but not limited to their name and Social Security number. Defendant used that PII to facilitate its employment of Plaintiffs, including payroll, and required Plaintiffs to provide that PII to obtain employment and payment for that employment.

---

[4] Privacy Policy, KemperSports, https://www.kempersports.com/privacy-policy/ (last visited September 16, 2024).

31.     On information and belief, KemperSports collects and maintains employees' unencrypted PII in its computer systems.

32.     In collecting and maintaining PII, Defendant implicitly agreed that it will safeguard the data using reasonable means according to its internal policy as well as state and federal law.

33.     According to the Breach Notice, KemperSports admits that "[o]n April 1, 2024, [it] became aware of suspicious activity on its computer network." Following an internal investigation, Defendant determined that "an unauthorized user accessed certain data on April 1, 2024." Defendant also refers to this unauthorized user as a "a threat actor [who] access[d] certain systems that stored protected personal information." Ex. A.

34.     In other words, the Data Breach investigation revealed Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain unencrypted files containing a treasure trove of thousands of its employees' highly private information.

35.     According to Defendant's, 62,815 individuals had their PII exposed in the Data Breach.[5]

36.     Moreover, the PII "accessed" by cybercriminals was highly sensitive and includes, but is not limited to, full names, addresses, Social Security numbers, financial information, medical information, and health insurance information.[6]

37.     Through its inadequate security practices, Defendant exposed Plaintiffs' and the Class's PII for theft and sale on the dark web.

---

[5] Data Breach Notifications, Office of the Maine Attorney General,
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/93093327-ac65-48f3-bd59-747c0d88bcea.html (last visited Dec. 26, 2024).
[6] https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (listing categories of PII exposed in the KemperSports Data Breach).

38. On or about September 9, 2024—five months after the Data Breach occurred—Defendant finally began notifying Class Members about the Data Breach.

39. Despite its duties to safeguard PII, Defendant did not in fact follow industry standard practices in securing employees' PII, as evidenced by the Data Breach.

40. Given the type of targeted attack in this case, the type of PII accessed, and the fact that such information was successfully exfiltrated by cybercriminals, there is a strong probability that the unencrypted PII of Plaintiffs and Class Members have been placed, or will be placed, on the black market/Dark Web for sale and purchase by criminals intending to utilize the PII for identity theft crimes.

41. Defendant was negligent and did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing the exposure of PII for Plaintiffs and Class Members.

42. For example, as evidenced by the Data Breach's occurrence, the infiltrated network was not protected by sufficient multi-layer data security technologies or effective firewalls.

43. Further, the fact that PII was acquired in the Data Breach demonstrates that the PII contained in the Defendant's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

44. In response to the Data Breach, KemperSports contends that it will "review our policies, procedures and processes related to the storage and access of personal information to reduce the likelihood of a similar future event." Ex. A. Though Defendant fails to expand on what actual steps will be taken to prevent future breaches from occurring, such steps, if any are taken at all, should have been in place before the Data Breach.

45.     Through its Breach Notice, Defendant recognized the actual imminent harm and injury that flowed from the Data Breach, and told Data Breach victims " to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity." Ex. A

46.     Through the Data Breach, Defendant recognized its duty to implement reasonable cybersecurity safeguards or policies to protect employees' PII, insisting that, despite the Data Breach demonstrating otherwise, "[t]he confidentiality, privacy, and security of personal information is among KemperSports' highest priorities" and "[w]e take the protection of your personal information very seriously[.]" Ex. A.

47.     On information and belief, KemperSports has offered limited complimentary credit monitoring services to victims, which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves PII that cannot be changed, such as Social Security numbers.

48.     Even with several months of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

49.     Moreover, Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

50.     According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information

increases." [7] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[8]

51.     The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

52.     A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[9]

53.     In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[10] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[11]

54.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and

---

[7] *See*
https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.
[8] *Id.*
[9] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[10] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/
[11] *See* https://www.investopedia.com/terms/s/ssn.asp

evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

55. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[12]

56. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiffs' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, . . . tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.")

---

[12] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

57.     Further still, cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class's financial accounts.

58.     On information and belief, KemperSports failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its employees' PII. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

**The Data Breach was a Foreseeable Risk of Which Defendant was on Notice.**

59.     It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

60.     In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[13] The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.[14] The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.[15]

61.     In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million

---

[13] *See 2023 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2024); https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf .

[14] *Id.*

[15] *Id*.

records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the PII that it collected and maintained would be targeted by cybercriminals.

62. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

63. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

64. In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks, including attacks involving data theft, because warnings were readily available and accessible via the internet.

65. Th readily available and accessible information discussed *supra* confirms that, prior to the Data Breach, Defendant knew or should have known that (i) cybercriminals were targeting entities such as Defendant, (ii) cybercriminals were ferociously aggressive in their pursuit of entities such as Defendant, and (iii) cybercriminals were leaking corporate information on dark web portals.

66. In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of thousands of its current and former employes in an Internet-accessible environment, had reason to be on guard for the

exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

67.     Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

68.     Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its employees' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Plaintiff Rachel Getzinger's Experience and Injuries***

69.     Plaintiff Getzinger provided her PII to Defendant as a condition of employment with Defendant. Plaintiff Getzinger is a former employee of Defendant.

70.     At the time of the Data Breach—on or about April 1, 2024—Defendant retained Plaintiff Getzinger's PII in its system.

71.     On or about September 9, 2024, Defendant sent Plaintiff Getzinger a notification letter confirming that her PII was improperly accessed and obtained by unauthorized third parties, including her full name and Social Security number.

72.     Plaintiff Getzinger's PII was compromised in the Data Breach and stolen by identity thieves who illegally accessed Defendant's network for the specific purpose of targeting the PII for misuse.

73.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

74. Defendant deprived Plaintiff of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about the Breach for five months.

75. Plaintiff Getzinger diligently protects her PII and stores any documents containing PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

76. Because of the nature of the PII affected by the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Getzinger made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, reviewing her credit report for fraudulent activity, changing passwords, and reviewing financial account transactions for fraudulent activity—which amounts to a monetary injury for which she seeks compensation. This time has been lost forever and cannot be recaptured.

77. Because of the invasion of her privacy and because of the risk of identity theft and fraud she must now face for years to come, Plaintiff Getzinger has and continues to suffer fear, anxiety, and stress.

78. Plaintiff Getzinger also suffered actual injury in the form of experiencing an increase in spam calls, which, upon information and belief, was caused by the Data Breach.

79. This misuse of her PII was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

80.     As a result of the Data Breach, Plaintiff Getzinger anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

81.     Because Defendant still maintains Plaintiff Getzinger's PII in its information system, Plaintiff Getzinger has a continuing interest in ensuring that Defendant implements and maintains reasonable cybersecurity measures going forward.

82.     Because of Defendant's failures, Plaintiff Getzinger has suffered a severe invasion of privacy and must now face a substantially increased risk of identity theft and financial fraud for years to come.

***Plaintiff Kelli Seal's Experience and Injuries***

83.     Plaintiff Seals provided her PII to Defendant as a condition of employment with Defendant. Plaintiff Seals is a former employee of Defendant.

84.     At the time of the Data Breach—on or about April 1, 2024—Defendant retained Plaintiff Seals' PII in its system.

85.     On or about September 9, 2024, Defendant sent Plaintiff Seals a notification letter confirming that her PII was improperly accessed and obtained by unauthorized third parties, including her full name, health insurance information, and Social Security number.

86.     Plaintiff Seals's PII was compromised in the Data Breach and stolen by identity thieves who illegally accessed Defendant's network for the specific purpose of targeting the PII for misuse.

87.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

88.     Defendant deprived Plaintiff of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about the Breach for five months.

89.     Plaintiff Seals diligently protects her PII and stores any documents containing PII in a safe and secure location.  She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

90.     Because of the nature of the PII affected by the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Seals made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, reviewing her credit report for fraudulent activity, changing passwords, and reviewing financial account transactions for fraudulent activity—which amounts to a monetary injury for which she seeks compensation. This time has been lost forever and cannot be recaptured.

91.     Because of the invasion of her privacy and because of the risk of identity theft and fraud she must now face for years to come, Plaintiff Seals has and continues to suffer fear, anxiety, and stress.

92.     Plaintiff Seals also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

93.     This misuse of her PII was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and

texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

94.     As a result of the Data Breach, Plaintiff Seals anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

95.     Because Defendant still maintains Plaintiff Seals's PII in its information system, Plaintiff Seals has a continuing interest in ensuring that Defendant implements and maintains reasonable cybersecurity measures going forward.

96.     Because of Defendant's failures, Plaintiff Seals has suffered a severe invasion of privacy and must now face a substantially increased risk of identity theft and financial fraud for years to come.

***Plaintiff Edwin Scheide's Experience and Injuries***

97.     Plaintiff Scheide provided his PII to Defendant as a condition of employment with Defendant. Plaintiff Scheide is a current employee of Defendant.

98.     At the time of the Data Breach—on or about April 1, 2024—Defendant retained Plaintiff Scheide's PII in its system.

99.     On or about September 9, 2024, Defendant sent Plaintiff Scheide a notification letter confirming that his PII was improperly accessed and obtained by unauthorized third parties, including his full name and Social Security number.

100.    Plaintiff Scheide's PII was compromised in the Data Breach and stolen by identity thieves who illegally accessed Defendant's network for the specific purpose of targeting the PII for misuse.

101. Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

102. Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about the Breach for five months.

103. Plaintiff Scheide diligently protects his PII and stores any documents containing PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

104. In the aftermath of the Data Breach, on or around June 2024, Plaintiff Scheide suffered actual injury when an unauthorized transaction for $200 was made from his checking account. Plaintiff Scheide was then forced to spend time on the phone with his financial institution's fraud department reporting this fraudulent transaction in order to be reimbursed. Further, Plaintiff Scheide was forced to spend time canceling his debit card and ordering a new debit card.

105. Upon information and belief, this fraud was caused by the Data Breach given the time proximity, the fact that Plaintiff Scheide had provided his checking account information to Defendant for payroll purposes, and that he had never experienced anything like this prior to then.

106. Plaintiff Scheide also suffered actual injury in the form of experiencing a dramatic increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

107. Because of the nature of the PII affected by the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Scheide made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, reviewing his credit report for fraudulent activity, changing passwords, working to dispute

the fraudulent charges attributed to his account, and reviewing financial account transactions for fraudulent activity—which amounts to a monetary injury for which he seeks compensation. This time has been lost forever and cannot be recaptured.

108.     Because of the invasion of his privacy and because of the risk of identity theft and fraud he must now face for years to come, Plaintiff Scheide has and continues to suffer fear, anxiety, and stress.

109.     This misuse of his PII was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

110.     As a result of the Data Breach, Plaintiff Scheide anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

111.     Because Defendant still maintains Plaintiff Scheide's PII in its information system, Plaintiff Seals has a continuing interest in ensuring that Defendant implements and maintains reasonable cybersecurity measures going forward.

112.     Because of Defendant's failures, Plaintiff Scheide has suffered a severe invasion of privacy and must now face a substantially increased risk of identity theft and financial fraud for years to come.

*Plaintiff Kendra Davila's Experience and Injuries*

113.    Plaintiff Davila provided her PII to Defendant as a condition of employment with Defendant. Plaintiff Davila is a former employee of Defendant.

114.    At the time of the Data Breach—on or about April 1, 2024—Defendant retained Plaintiff Davila's PII in its system.

115.    On or about September 9, 2024, Defendant sent Plaintiff Davila a notification letter confirming that her PII was improperly accessed and obtained by unauthorized third parties, including her full name, health insurance information, and Social Security number.

116.    Plaintiff Davila's PII was compromised in the Data Breach and stolen by identity thieves who illegally accessed Defendant's network for the specific purpose of targeting the PII for misuse.

117.    Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

118.    Defendant deprived Plaintiff of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about the Breach for five months.

119.    Plaintiff Davila diligently protects her PII and stores any documents containing PII in a safe and secure location.  She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

120.    Because of the nature of the PII affected by the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Davila made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, reviewing her credit report for fraudulent activity, changing passwords, and reviewing

financial account transactions for fraudulent activity—which amounts to a monetary injury for which she seeks compensation. This time has been lost forever and cannot be recaptured.

121.    Because of the invasion of her privacy and because of the risk of identity theft and fraud she must now face for years to come, Plaintiff Davila has and continues to suffer fear, anxiety, and stress.

122.    Plaintiff Davila also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

123.    This misuse of her PII was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

124.    As a result of the Data Breach, Plaintiff Davila anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

125.    Because Defendant still maintains Plaintiff Davila's PII in its information system, Plaintiff Davila has a continuing interest in ensuring that Defendant implements and maintains reasonable cybersecurity measures going forward.

126.    Because of Defendant's failures, Plaintiff Davila has suffered a severe invasion of privacy and must now face a substantially increased risk of identity theft and financial fraud for years to come.

***Plaintiff William Campe's Experience and Injuries***

127.    Plaintiff Campe provided his PII to Defendant as a condition of employment with Defendant. Plaintiff Campe is a former employee of Defendant.

128.    At the time of the Data Breach—on or about April 1, 2024—Defendant retained Plaintiff Campe's PII in its system.

129.    On or about September 9, 2024, Defendant sent Plaintiff Campe a notification letter confirming that his PII was improperly accessed and obtained by unauthorized third parties, including his full name, address, and Social Security number.

130.    Plaintiff Campe's PII was compromised in the Data Breach and stolen by identity thieves who illegally accessed Defendant's network for the specific purpose of targeting the PII for misuse.

131.    Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

132.    Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about the Breach for five months.

133.    Plaintiff Campe diligently protects his PII and stores any documents containing PII in a safe and secure location.  He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

134.    Because of the nature of the PII affected by the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Campe made reasonable efforts to mitigate the impact of the

Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, reviewing his credit report for fraudulent activity, changing passwords, and reviewing financial account transactions for fraudulent activity—which amounts to a monetary injury for which he seeks compensation. This time has been lost forever and cannot be recaptured.

135.    Because of the invasion of his privacy and because of the risk of identity theft and fraud he must now face for years to come, Plaintiff Campe has and continues to suffer fear, anxiety, and stress.

136.    As a result of the Data Breach, Plaintiff Campe anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

137.    Because Defendant still maintains Plaintiff Campe's PII in its information system, Plaintiff Campe has a continuing interest in ensuring that Defendant implements and maintains reasonable cybersecurity measures going forward.

138.    Because of Defendant's failures, Plaintiff Campe has suffered a severe invasion of privacy and must now face a substantially increased risk of identity theft and financial fraud for years to come.

***Plaintiff Corey Bergamo's Experience and Injuries***

139.    Plaintiff Bergamo provided his PII to Defendant as a condition of employment with Defendant. Plaintiff Bergamo was employed by Defendant from 2014 to 2016.

140.    At the time of the Data Breach—on or about April 1, 2024—Defendant retained Plaintiff Bergamo's PII in its system.

141.    On or about September 9, 2024, Defendant sent Plaintiff Bergamo a notification letter confirming that his PII was improperly accessed and obtained by unauthorized third parties, including his full name and Social Security number.

142.    Plaintiff Bergamo's PII was compromised in the Data Breach and stolen by identity thieves who illegally accessed Defendant's network for the specific purpose of targeting the PII for misuse.

143.    Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

144.    Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about the Breach for five months.

145.    Plaintiff Bergamo diligently protects his PII and stores any documents containing PII in a safe and secure location.  He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

146.    Because of the nature of the PII affected by the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Bergamo made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, reviewing his credit report for fraudulent activity, changing passwords, and reviewing financial account transactions for fraudulent activity—which amounts to a monetary injury for which he seeks compensation. This time has been lost forever and cannot be recaptured.

147.    Because of the invasion of his privacy and because of the risk of identity theft and fraud he must now face for years to come, Plaintiff Bergamo has and continues to suffer fear, anxiety, and stress.

148.    Plaintiff Bergamo also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

149.    This misuse of his PII was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

150.    As a result of the Data Breach, Plaintiff Bergamo anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

151.    Because Defendant still maintains Plaintiff Bergamo's PII in its information system, Plaintiff Bergamo has a continuing interest in ensuring that Defendant implements and maintains reasonable cybersecurity measures going forward.

152.    Because of Defendant's failures, Plaintiff Bergamo has suffered a severe invasion of privacy and must now face a substantially increased risk of identity theft and financial fraud for years to come.

***Plaintiff Tracy Kading's Experience and Injuries***

153.    Plaintiff Kading provided her PII to Defendant as a condition of employment with Defendant. Plaintiff Kading was employed by Defendant during the summers of 2017 and 2018.

154. At the time of the Data Breach—on or about April 1, 2024—Defendant retained Plaintiff Kading's PII in its system.

155. On or about September 9, 2024, Defendant sent Plaintiff Kading a notification letter confirming that her PII was improperly accessed and obtained by unauthorized third parties, including her full name and Social Security number.

156. Plaintiff Kading's PII was compromised in the Data Breach and stolen by identity thieves who illegally accessed Defendant's network for the specific purpose of targeting the PII for misuse.

157. Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

158. Defendant deprived Plaintiff of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about the Breach for five months.

159. Plaintiff Kading diligently protects her PII and stores any documents containing PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

160. Because of the nature of the PII affected by the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Kading made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, reviewing her credit report for fraudulent activity, changing passwords, and reviewing financial account transactions for fraudulent activity—which amounts to a monetary injury for which she seeks compensation. This time has been lost forever and cannot be recaptured.

161.     Because of the invasion of her privacy and because of the risk of identity theft and fraud she must now face for years to come, Plaintiff Kading has and continues to suffer fear, anxiety, and stress.

162.     Plaintiff Kading also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

163.     This misuse of her PII was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

164.     As a result of the Data Breach, Plaintiff Kading anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

165.     Because Defendant still maintains Plaintiff Kading's PII in its information system, Plaintiff Kading has a continuing interest in ensuring that Defendant implements and maintains reasonable cybersecurity measures going forward.

166.     Because of Defendant's failures, Plaintiff Kading has suffered a severe invasion of privacy and must now face a substantially increased risk of identity theft and financial fraud for years to come.

*Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft*

167. Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

168. As a result of KemperSports' failure to prevent the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiffs and the Class have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their PII is used;

b. The diminution in value of their PII;

c. The compromise and continuing publication of their PII;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen PII; and

h. The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

169. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

170. The value of Plaintiffs' and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

171. Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

172. It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

173. One such example of criminals using PII for profit is the development of "Fullz" packages.

174. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

175. The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII

stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and members of the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

176.    Defendant disclosed the PII of Plaintiffs and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiffs and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (*i.e.*, identity fraud), all using the stolen PII.

177.    Defendant's failure to properly notify Plaintiff and the Class of the Data Breach exacerbated Plaintiffs' and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant failed to adhere to FTC guidelines.***

178.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

179.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

    a.   protect the personal customer information that they keep;

    b.   properly dispose of personal information that is no longer needed;

    c.   encrypt information stored on computer networks;

    d.   understand their network's vulnerabilities; and

    e.   implement policies to correct security problems.

180.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

181.    The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

182.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

183.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

184.    Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

185.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

186.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

187.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

188.    Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3),

individually and on behalf of all members of the following class:

> **All individuals residing in the United States whose PII was compromised in the Data Breach discovered by Defendant in April 2024, including all those who received notice of the Data Breach.**

189.    Excluded from the Class is Defendant, its agents, affiliates, parents, subsidiaries,

any entity in which Defendant have a controlling interest, any of Defendant's officers or directors,

any successors, and any Judge who adjudicates this case, including their staff and immediate

family.

190.    Plaintiffs reserve the right to amend the class definition.

191.    This action satisfies the numerosity, commonality, typicality, and adequacy

requirements under Fed. R. Civ. P. 23.

a.  **Numerosity**. Plaintiffs are representative of the Class, consisting of 62,815

members, far too many to join in a single action;

b.  **Ascertainability**. Members of the Class are readily identifiable from information

in Defendant's possession, custody, and control;

c.  **Typicality**. Plaintiffs' claims are typical of class claims as each arises from the

same Data Breach, the same alleged violations by Defendant, and the same

unreasonable manner of notifying individuals about the Data Breach.

d.  **Adequacy**. Plaintiffs will fairly and adequately protect the proposed Class's

interests. Their interests do not conflict with the Class's interests, and they have

retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

e. **Commonality**. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for the Class. Indeed, it will be necessary to answer the following questions:

i. Whether Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

ii. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

iii. Whether Defendant was negligent in maintaining, protecting, and securing PII;

iv. Whether Defendant breached contract promises to safeguard Plaintiffs' and the Class's PII;

v. Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

vi. Whether Defendant's Breach Notice was reasonable;

vii. Whether the Data Breach caused Plaintiffs' and the Class's injuries;

viii. What the proper damages measure is; and

ix. Whether Plaintiffs and the Class are entitled to damages, treble damages, or injunctive relief.

192. Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to

fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

## FIRST CLAIM FOR RELIEF
### Negligence
### (On Behalf of Plaintiffs and the Class)

193.   Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

194.   Plaintiffs and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

195.   Defendant owed a duty of care to Plaintiffs and Class members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

196.   Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

197.   Defendant owed these duties to Plaintiffs and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs and Class members' PII.

198.   Defendant owed—to Plaintiffs and Class members—at least the following duties to:

  a.   exercise reasonable care in handling and using the PII in its care and custody;

  b.   implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

  c.   promptly detect attempts at unauthorized access;

d.  notify Plaintiffs and Class members within a reasonable timeframe of any breach to the security of their PII.

199.  Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

200.  Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

201.  Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

202.  Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

203.  Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class members' PII.

204.  Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC

publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class members' sensitive PII.

205. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

206. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII— whether by malware or otherwise.

207. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class members' and the importance of exercising reasonable care in handling it.

208. Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

209. Defendant breached these duties as evidenced by the Data Breach.

210. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class members' PII by:

    a. disclosing and providing access to this information to third parties and

b.   failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

211.   Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

212.   Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class members' injuries-in-fact.

213.   Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

214.   As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

215.   And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

216.   Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted

from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

217.     Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

218.     Defendant offered to employ Plaintiffs and members of the Class if, as a condition of that employment, Plaintiffs and members of the Class provided Defendant with their PII.

219.     In turn, Defendant agreed it would not disclose the PII it collects to unauthorized persons. Defendant also promised to safeguard employees' PII.

220.     Plaintiffs and the members of the Class accepted Defendant's offer by providing PII to Defendant in exchange for employment with Defendant.

221.     Implicit in the parties' agreement was that Defendant would provide Plaintiffs and members of the Class with prompt and adequate notice of all unauthorized access and/or theft of their PII.

222.     Plaintiffs and the members of the Class would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant or would have demanded higher wages.

223.     Indeed, the Privacy Policy posted on Defendant's website reassures: "We follow generally accepted industry standards designed to protect the personal information we receive from unauthorized access or disclosure."[16]

224.     Defendants' conduct and statements confirm that Defendants intended to bind themselves to protect the PII that Plaintiffs and the Class entrusted to Defendants.

---

[16] Privacy Policy, KemperSports, https://www.kempersports.com/privacy-policy/ (last visited September 16, 2024).

225. Defendant materially breached the contracts it had entered with Plaintiffs and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiff and members of the Class by:

    a. Failing to properly safeguard and protect Plaintiffs' and members of the Class's PII;

    b. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

    c. Failing to ensure the confidentiality and integrity of electronic PII that Defendant created, received, maintained, and transmitted.

226. The damages sustained by Plaintiffs and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

227. Plaintiffs and members of the Class have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

228. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

229.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

230.     Defendant failed to advise Plaintiffs and members of the Class of the Data Breach promptly and sufficiently.

231.     In these and other ways, Defendant violated its duty of good faith and fair dealing.

232.     Plaintiffs and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

233.     Plaintiffs, on behalf of themselves and the Class, seek compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of the Plaintiffs and the Class)

234.     Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

235.     This claim is plead in the alternative to the breach of implied contractual duty claim.

236.     Plaintiffs and members of the Class conferred a benefit upon Defendant in the form of services through employment. Defendant also benefited from the receipt of Plaintiffs' and the Class's PII, as this was used to facilitate their employment.

237.     Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiffs and members of the Class.

238.     Plaintiffs and Class Members would not have accepted employment from Defendant or would have demanded to be paid more had they known the true state of affairs regarding the deficiencies in Defendant's data security practices.

239. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

240. Under principals of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and the proposed Class's services and their PII because Defendant failed to adequately protect their PII. Plaintiffs and the proposed Class would not have provided their PII or worked for Defendant at the payrates they did had they known Defendant would not adequately protect their PII.

241. Defendant should be compelled to disgorge into a common fund to benefit Plaintiffs and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged here.

**FOURTH CLAIM FOR RELIEF**
**Invasion of Privacy**
**(On Behalf of the Plaintiffs and the Class)**

242. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

243. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

244. Defendant owed a duty to its employees, including Plaintiffs and the Class, to keep this information, particularly their confidential medical information and health insurance information, confidential.

42

245. The unauthorized acquisition (*i.e.*, theft) by a third party of Plaintiffs' and Class Members' PII, including their medical information and health insurance information, is highly offensive to a reasonable person.

246. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant as part of their employment, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

247. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

248. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

249. Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

250. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

251. As a proximate result of Defendant's acts and omissions, the PII of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

252.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class because their PII are still maintained by Defendant with its inadequate cybersecurity system and policies.

253.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

254.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other members of the Class, also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## PRAYER FOR RELIEF

Plaintiffs and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing their counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

C.    Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and the Class;

D.    Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E.  Awarding Plaintiffs and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.  Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

G.  Awarding attorneys' fees and costs, as allowed by law;

H.  Awarding prejudgment and post-judgment interest, as provided by law;

I.  Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.  Granting such other or further relief as may be appropriate under the circumstances.

**JURY DEMAND**

Plaintiffs hereby demand that this matter be tried before a jury.


Dated: January 6, 2025                By: */s/ Raina C. Borrelli*
                                      Raina C. Borrelli
                                      STRAUSS BORRELLI PLLC
                                      One Magnificent Mile
                                      980 N Michigan Avenue, Suite 1610
                                      Chicago IL, 60611
                                      Telephone: (872) 263-1100
                                      Facsimile: (872) 263-1109
                                      raina@straussborrelli.com

                                      Gary M. Klinger
                                      MILBERG COLEMAN BRYSON PHILLIPS
                                      GROSSMAN, PLLC
                                      227 W. Monroe Street, Suite 2100
                                      Chicago, IL 60606
                                      Tel.: (866) 252-0878
                                      Email: gklinger@milberg.com

                                      Brooke Murphy (*pro hac vice* application
                                      forthcoming)
                                      MURPHY LAW FIRM
                                      4116 Will Rogers Pkwy, Suite 700

Oklahoma City, OK 73108
T: (405) 389-4989
E: abm@murphylegalfirm.com

Gerard Stranch, IV (TN BPR # 23045)
Grayson Wells (TN BPR # 039658)
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

*Plaintiffs' Executive Committee*

Josh Sanford Arkansas Bar No. 2001037
jsanford@eksm.com
EKSM, LLP 10800
Financial Centre Parkway Suite 510
Little Rock, Arkansas 72211
Phone: (501) 221-0088
Fax: (888) 787-2040

Jarrett L. Ellzey* Texas Bar No. 24040864 (*pro hac vice* application forthcoming)
jellzey@eksm.com
EKSM, LLP
1105 Milford Street
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455

Nickolas J. Hagman
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
20 North Wacker, Suite 4120
Chicago, IL 60606
773.661.4710
NHagman@caffertyclobes.com

*Additional Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I, Raina C. Borrelli, hereby certify that on January 6, 2025, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of

such filing to counsel of record, below, via the ECF system.

DATED this 6th day of January, 2025.

STRAUSS BORRELLI PLLC

By: */s/ Raina C. Borrelli*
    Raina C. Borrelli
    raina@straussborrelli.com
    STRAUSS BORRELLI PLLC
    One Magnificent Mile
    980 N Michigan Avenue, Suite 1610
    Chicago IL, 60611
    Telephone: (872) 263-1100
    Facsimile: (872) 263-1109